THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRIAN CONLAN, Appellant.

First Department, May 2, 1989

**APPEARANCES OF COUNSEL**

*Mark Dwyer* of counsel *(Donna Krone* with him on the brief;

*Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Stephanie T. Knowles* of counsel *(Philip L. Weinstein,* attorney), for appellant.

### OPINION OF THE COURT

MILONAS, J.

Defendant Brian Conlan was convicted, following a jury trial, of two counts of murder in the second degree and criminal possession of a weapon in the second degree and was sentenced to two concurrent terms of imprisonment of from 20 years to life to be served concurrently with a term of from 4 to 12 years. On appeal, defendant contends that the judgment against him must be reversed and a new trial directed on the ground that he was denied his right to a fair trial and to due process of law when the prosecutor failed to correct the false statements of a witness that no promises had been made in exchange for his testimony.

In the early afternoon of September 3, 1983, attorney Yale Bernstein and his wife Susan, visiting from Pennsylvania for the day, were having lunch in a Greenwich Village restaurant. They were the only patrons until two men, one of whom was subsequently identified as defendant herein, walked in and sat down at the next table. The two men ordered coffee but departed before it arrived, some 3 to 5 minutes after they had entered. The Bernsteins finished their meal and then left the restaurant. They strolled around the neighborhood, wandering in and out of some shops and making a number of purchases. Sometime between 1:00 P.M. and 1:30 P.M., as the Bernsteins were proceeding south on Greenwich Avenue, they were near a playground when Susan Bernstein observed defendant approaching them and recognized him as one of the men in the restaurant. Since defendant was coming straight towards them, the Bernsteins moved apart to let him through. Although defendant bumped into her husband, Susan Bernstein continued on for a few feet, believing that her husband would follow. From the corner of her eye, she noticed that defendant and her husband had stopped and that while defendant had placed his left hand on her husband's shoulder, he made no attempt to take anything. Susan Bernstein heard her husband say "no", but she kept on walking in order to discourage defendant. However, when she looked back to ascertain why her husband had failed to join her, she could

see that the man was no longer on the street and realized that something had happened to her husband. She returned to her husband, who informed her that he had been shot. He crumpled to the ground, losing consciousness, and, after efforts by passersby to administer resuscitation were unavailing, he was removed to the hospital where he died.

Frank Ferrero, the owner of a nearby restaurant, was glancing out of the window at the playground across the street when he noticed a man and woman walking down the street. The couple was approached by another man, and all three people halted. While Ferrero did not hear a shot, he could see the single man raise his arm, and the other man then grabbed his chest and fell backwards. Ferrero ran outside, observing the single man cross the street and get into a waiting car, the motor of which was running, and drive off in a westerly direction. In the meantime, John Ottavino and Christina Smith, who had just reached the corner of Charles Street and Greenwich Avenue, heard a noise that sounded like a firecracker. They saw a man on Greenwich Avenue carrying a pistol in his right hand, which he tucked into his waistband before entering an old yellow or cream-colored Volkswagen whose license plate they both memorized and later provided to the police. The vehicle was subsequently determined to be registered to codefendant Thomas Prendergast and was found to contain 11 prints on the passenger door, 7 of which had been made by defendant's fingers and 1 by his right palm. Three of the prints were too illegible to be matched. In addition, Susan Bernstein identified defendant at a lineup and again at trial as the taller man in the restaurant and the one who had come up to her and her husband on the street. Although Ottavino and Smith each picked out defendant at a lineup, they were unable to repeat that identification at trial.

Defendant, a methadone addict, took the stand in his own behalf. While his account of the shooting was frequently contradictory in detail and also conflicted at times with statements previously made by him to law enforcement officers, in essence his version of events is as follows: On September 3, 1983, defendant and his friend Thomas Prendergast drove in the latter's car from Brooklyn to Manhattan in order to locate some sources of methadone. Defendant carried a small plastic bag containing a .38 caliber gun loaded with three rounds that had been purchased about a week earlier; he was not aware if the hammer of the weapon was cocked. According to defendant, he was ill, shaking and suffering from withdrawal

symptoms. After an unsuccessful attempt to find someone selling methadone at a number of places that he visited, defendant decided to try the vicinity of a clinic on 23rd Street and First Avenue and also Union Square Park. Prendergast then parked his automobile on Seventh Avenue and 12th Street, near St. Vincent's Hospital. The two men went in search of methadone dealers in several restaurants, one of which was an almost empty restaurant across from the playground on Greenwich Avenue. Eventually Prendergast returned to his car, and defendant walked around the block next to the playground, still holding the bag with the gun. As he was circling the block, he "bumped" into or "made physical contact" with another man. Since the incident occurred so quickly, defendant was not certain of precisely what happened, but he recalled that the man was looking down, prompting him to do the same, and he noticed that the barrel of his gun was protruding from the bag. Defendant and the man were standing close to each other; the other man might have reached out his left arm and might have touched defendant or defendant might have touched him. (Defendant admitted on cross-examination that he had initially given a prosecutor a different scenario than the one that he was offering at trial.) At any rate, the weapon discharged suddenly either as defendant was endeavoring to push it back inside the bag or when, after he and the other man had bumped, defendant raised the arm carrying the gun. Defendant then ran to Prendergast's car and told his companion to take off. Defendant asserted that he tossed the gun out of the window as they drove back to Brooklyn but could not recall what he did with the plastic bag. He also claimed that he did not demand any money or jewelry from the man and had no intention of robbing or killing him.

On cross-examination, defendant was questioned concerning conversations which he had had with one Salvatore Florio while the two were incarcerated in the same cell block on Rikers Island in April and May of 1984. Although defendant conceded that he had spoken with Florio, he denied having ever discussed the shooting of Yale Bernstein with him. The People, in rebuttal, called Florio as a witness. Florio, who had between 20 and 30 prior criminal convictions, was, at the time of the trial, being held in New Jersey on charges of theft and escape. There was also a detainer lodged against him for a parole violation on a Texas felony. Indeed, Florio had spent most of his days since 1963 in custody; from the age of 17 on

and until 1983, he had used heroin on and off; he had also been a paid informant for the narcotics task force of a New Jersey Sheriff's office. Florio testified that he had met defendant when he was incarcerated at the Men's House of Detention at Rikers Island on a New York County weapons charge, and defendant was being housed in the same cell block. During that time, defendant, Florio and three other white inmates became friendly and frequently talked with each other about their respective cases. In that regard, defendant told his cellmates that he had gone to Greenwich Village to deliver cocaine and that he visited the restaurant with Prendergast to make a "drop", and, while there, he determined to rob a certain man whom he observed to have money and jewelry. Florio further recounted that defendant claimed to have thereafter left the restaurant, directing Prendergast to double park the car up the street since he intended to "rip the guy off". Defendant then went over to the playground to wait for the man and his wife to emerge. According to defendant, he subsequently approached the man, displaying a gun, and informed his victim that he planned to rob him. The man noticed the weapon and jumped back, whereupon defendant shot him. Defendant, however, departed without taking any money since it was broad daylight, and there were many people in the area.

Defendant also purportedly expressed concern that the police had a witness who had seen him hanging around the playground waiting for the victims and indicated doubt about Prendergast's reliability. In addition, defendant explained to Florio that he intended to tell the jury that he was walking down the street with the gun in a bag, that the weapon had, unknowingly to him, become partially visible, and when he encountered the deceased, the latter, glimpsing the gun, jumped at him, thereby causing the weapon to discharge. Florio asserted that defendant believed that because there were no witnesses to prove that he had fired point blank, the foregoing story would result in a lesser sentence. In response to an inquiry by the District Attorney as to whether he had been offered a deal in exchange for his testimony, Florio denied that he had received any consideration although he did concede that he had requested special protective housing during his stay in New York, and she had arranged for it. In fact, Florio was insistent that notwithstanding that he had in the past discussed other cases with other District Attorneys in New York County and had testified for the People on another

occasion, no one had promised him anything. His only motive in taking the stand, he urged, was that he had become tired of defendant's bragging about killing someone and acting "like he was big tough guy". Florio, moreover, stated that neither Assistant District Attorney William Hoyt, another prosecutor in the New York County office, nor anybody else had committed to writing a letter on his behalf to the New Jersey authorities so that he would receive a lighter sentence or be released on bail. Indeed, the lawyer who had recently been assigned to protect his rights during the trial had advised him against testifying in the absence of any guarantees, but he had informed his attorney that he was not taking the stand in defendant's case with the expectation of being accorded favorable treatment in New Jersey.

The defense, in surrebuttal, called Lawrence Kravitz, Florio's appointed counsel. According to Kravitz, he had approached Assistant District Attorney Hoyt concerning a possible deal for Florio, and, in the course of that conversation, it was made known to him that the Manhattan District Attorney's office would somehow communicate to the New Jersey authorities Florio's cooperation in the New York case despite the fact that the specifics that that communication would take were not mentioned. In that respect, Kravitz had gone to Hoyt, who was not the attorney handling defendant's prosecution, since he was under the impression that the latter was empowered to negotiate a deal, and Hoyt had never indicated that he did not possess such authority. Hoyt had merely stated that he had discussed the situation with Patricia Curran, the trial assistant, and that she opposed any agreement. At any rate, Kravitz reported his conversation with Hoyt to Florio, noting that while he believed that something would be said to the New Jersey authorities regarding Florio's cooperation, no firm arrangement had been concluded. In reply to Kravitz's question as to whether he wanted a definite commitment, Florio declared that he did not, having every confidence that Hoyt would take care of him.

To rebut Kravitz's testimony, Patricia Curran, the Assistant District Attorney trying this case, testified that she was the one in charge of defendant's case and that it was she who made all decisions in connection with that matter. Assistant District Attorney Hoyt was in a different bureau and was not her supervisor or responsible for the management of her cases. Curran had first met Florio in October of 1984 when he was preparing to testify in an unrelated murder trial. At that

time, she engaged in a brief conversation with him and was accorded a shortened account of defendant's alleged admissions. She spoke with Florio again on the Friday before Florio started to testify, at which time he advised her over the telephone that he would be in New York on Monday. However, he did not arrive until Tuesday, January 22, 1985, and, on that date, she discussed the case with Florio in much greater detail while they were in her office. Florio expressed discontent that as a consequence of his coming to New York, he would be losing a choice cell in New Jersey, but he rejected Curran's proposal that she call the Bergen County prosecutor in order to request the return of his cell. Florio was also concerned about his accommodations in New York, and she consented to arrange for special housing. However, Curran was vehement in denying that she had made any other promises to Florio or Kravitz in exchange for Florio's testimony, claiming that Florio had never demanded any deal.

During the People's summation, Curran was critical of Kravitz's conduct in speaking with Hoyt "despite the fact that Mr. Kravitz sat here the entire day before, in that chair right over there by the jury, saw myself as the only Assistant District Attorney in this courtroom, saw only me examining any witnesses, saw only myself approaching the bench to discuss this case, saw only one person sitting at the District Attorney's table, saw only one person participating in bench conference with himself." Proceeding to characterize Kravitz as a "little bit disingenuous" because he was cognizant that Curran had declined to make any commitments to Florio, she remarked rhetorically, "[s]o what does Kravitz do? Mr. Kravitz goes across the street and he speaks to another Assistant D.A., someone who has nothing to do with this case, and he manages to finagle this Assistant into saying something to the effect that this Assistant is going to write some sort of letter to the Bergen County D.A.'s office saying, 'Yes, Mr. Florio testified for us in a homicide case.' " The prosecutor perceived a conflict in the relationship between Florio and Kravitz in that "first of all, Mr. Florio said that that was never communicated to him, Mr. Kravitz insisted it was, but Mr. Florio said that that had never been communicated to him. So it doesn't affect his testimony at all. * * * Then the next thing you know, from Mr. Kravitz's own mouth, Mr. Florio asked the judge to fire Mr. Kravitz because it was Mr. Florio's belief that Mr. Kravitz had gone and had conversations with Mr. Conlan's attorney concerning discussions that he, Florio, had

had with Mr. Kravitz. So you judge for yourselves what's going on in terms of that situation." Later, Curran commented favorably on the credibility of Florio—"don't Mr. Florio's statements have the ring of truth about them?"—presumably, in contrast to Kravitz's version of events.

Defendant was found guilty of two counts of murder in the second degree and criminal possession of a weapon in the second degree. On April 12, 1985, following the verdict but prior to sentencing, Assistant District Attorney Michael Cherkasky appeared before the trial court to announce that he had conducted an investigation into whether any promises had been made to Florio or his counsel, Lawrence Kravitz. He then reported that his probe had revealed that neither Hoyt, Curran or anyone else had made any specific promises to Florio in exchange for his testimony in defendant's case, that Florio had never demanded anything from Curran and that she believed that his presence was not predicated on any arrangement between him and the prosecution. However, Hoyt was under the impression that Florio anticipated that he would receive assistance with the matters pending against him in New Jersey, which expectation derived from implicit assurances made by Hoyt to Florio to the effect that he would be helped. Cherkasky determined that Hoyt had conveyed to Curran his understanding that Florio expected some benefit from his testimony despite the fact that he had not been given any definite promises. Although Hoyt and Curran disagreed about Florio's supposed expectation, and Curran operated under the assumption that no deal had been made, Florio had stated to Cherkasky during a subsequent interview that he had lied when he asserted at trial that he had not received any promises. Moreover, Hoyt had explicitly undertaken to Kravitz that the People would communicate with the New Jersey authorities, either by letter or otherwise, and make known to them Florio's cooperation. Cherkasky, thus, found that Kravitz had testified truthfully and that the jury was unintentionally misled by Curran's arguments in support of Florio's contrary claims.

Defendant thereafter moved to set aside the verdict pursuant to CPL 330.30, contending that Curran had acted improperly and that Florio's false testimony had impacted negatively on the defense's effort to persuade the jury to bring in a verdict on a lesser included charge. A hearing on the motion was conducted in September of 1985, and Lawrence Kravitz, William Hoyt, Salvatore Florio, Michael Cherkasky and Patri-

cia Curran all took the stand, as well as another Assistant District Attorney, Ed Stancik. The facts that emerged from their testimony largely confirm the validity of the conclusions drawn by Cherkasky following his own investigation. In short, it is evident that Florio, a long-time informant, had a prior relationship with Hoyt based upon assistance which Florio had provided to him in the past. Therefore, when Curran learned that Florio possessed information relevant to defendant's case, but she was unable to procure Florio's voluntary appearance in New York, she turned to Hoyt for help in obtaining Florio's cooperation. He agreed, suggesting that she first telephone the Bergen County prosecutor's office to notify authorities that Florio was a potential witness in a New York homicide matter and ascertain what they would be willing to do in the event that he cooperated. (She later did so and was assured by a Deputy District Attorney that his office would accede to the wishes of the New York District Attorney.) Hoyt also proposed that Curran write a letter to the New Jersey authorities with respect to Florio's testimony, and it appears that Hoyt and Curran at some point agreed that such a letter would be sent although this accord was never related to Florio nor was he informed of Curran's conversation with the New Jersey prosecutor. At any rate, Hoyt spoke to Florio in New Jersey and when the latter expressed unease about the charges against him in New Jersey, Hoyt encouraged Florio to come to New York, urging in a general fashion that everything would be all right. Therefore, Hoyt offered no explicit commitments, but he did tell Florio to trust him and that the situation in New Jersey would work out. According to Hoyt, while no definite promises were made, he believed that the purport of his conversation with Florio was sufficient to create in Florio the expectation of a benefit in return for his testimony.

Consequently, Hoyt subsequently advised Kravitz that he anticipated that his office would communicate in some manner with the New Jersey authorities concerning Florio's testimony. He declined, however, to make a firm commitment of a specific promise, explaining that Curran was opposed to making any deals. However, Hoyt did later inform Curran that he had told Kravitz that the People would write to the New Jerey authorities on behalf of Florio, stating that "I said to her something to the effect that—this wasn't a big thing, that she should stipulate" to the fact that he had made these representations to Kravitz and that, if necessary, she could

call him as a witness to explain the situation. Similarly, Kravitz admitted that no explicit promises were conveyed to him but he concluded from his conversation with Hoyt that the Manhattan District Attorney intended to do something to aid Florio with his New Jersey cases. Further, Kravitz was under the impression that Florio was convinced that some consideration would accrue to him as a result of his testimony since Florio insisted that he had faith that Hoyt would do the right thing by him and rejected Kravitz's recommendation that a definite arrangement be worked out. Curran, in contrast, adamantly maintained that she was the trial attorney in defendant's case, and, as such, she was the one empowered to make any deals with prospective witnesses, and she had never made any promises to Florio. Moreover, Florio had never expressed an interest to her in wanting something in exchange for his testimony. Hoyt, however, testified that he had stated to Curran that Florio was a career informant who certainly anticipated some benefit and that if Florio had told her that he did not expect anything, it was only because he believed that that was what Curran desired to hear.

After defendant's trial was concluded, Florio endeavored to telephone Curran on a number of occasions, but she would not accept his calls. The only time that he managed to reach her occurred when Curran happened to pick up the telephone herself and Florio was on the other end. Curran claimed that the subject of her contacting the New Jersey authorities on his behalf did not arise. Florio did complain to Hoyt, whom he also telephoned, about Curran's refusals to take his calls and that nothing had been done for him. He requested that Hoyt intervene with the New Jersey prosecutor, and Hoyt did, indeed, subsequently speak with the New Jersey prosecutor concerning the fact that Florio had testified helpfully in New York, resulting in a conviction, and requested that New Jersey do what it could with regard to Florio's sentence there. Florio was eventually sentenced to time served. At the hearing, Florio asserted that while no one had made him a guaranteed commitment, Curran had indicated that she would attempt to help him with his New Jersey matters, informing him that "[i]f I make you a promise now—if I make you a promise and you get on the witness stand and you're asked if any promises were made to you, you would have to lie and say no but if I don't make you any promises now, or tell you anything, then you don't have to get on the witness stand and lie because nobody made you no *[sic]* promises." Florio under-

stood Curran's statement to mean that she was impliedly urging him to testify that no promises had been made to him. Finally, it should be noted that Curran denied ever having told Florio that she would take care of him so long as there were no specific promises or having instructed him, directly or indirectly, to lie with respect to any promises. She also stated that her conversations with Hoyt regarding a letter to the New Jersey authorities were purely hypothetical and that no actual agreement to send such a letter had ever been reached.

In denying the motion to set aside the verdict, the court held that defendant had not met his burden of demonstrating grounds that would require reversal as a matter of law since there was an insufficient factual basis for finding that Florio's testimony was bargained for either explicitly or implicitly or that any promise was then suppressed by Assistant District Attorney Curran. In reaching her decision, the court disregarded the report prepared by Cherkasky in that the investigation upon which was founded "was incomplete and rested on hearsay and unsupported conclusions". The court also largely rejected Florio's posttrial statements as not credible. In the view of the Trial Judge, Florio's repetition of his trust in Hoyt was not a sufficient reason to infer that the witness had an expectation of a benefit, nor could a deal be premised, as Hoyt believed it to have been, on the "tone" of the conversation between him and Florio. The court, in addition, perceived a "lack of consensus" between Hoyt and Curran because while Hoyt was under the impression that Florio, "as a career informant and criminal, would automatically expect some consideration for his testimony", Curran repeatedly maintained that Florio had not requested anything of the District Attorney's office. Moreover, the court deemed significant that "the jury was informed through Mr. Kravitz's testimony of the alleged existence of a promise by the District Attorney's Office. The jury was also made aware of Florio's long and extensive participation in criminal conduct and his involvement as an informant. The credibility of this witness was clearly an issue which was presented to the jury and the possible existence of a promise was yet another entry on a long line of factors that the jury could consider with regard to that question."

The New York Court of Appeals, citing *People v Cwikla* (46 NY2d 434, 441), has recently reaffirmed the well-settled doctrine that the " 'existence of an agreement between the prosecution and a witness, made to induce the testimony of

the witness, is evidence which must be disclosed under *Brady* principles' " *(People v Novoa,* 70 NY2d 490, 496). Further, "[i]t is not the form of a promise, or any label the parties may affix to it, that triggers the prosecutor's duty of disclosure" *(People v Novoa, supra,* at 497). The obligation attaches even where the promise is a contingent one or is insubstantial or implicit rather than explicit, since the duty of disclosure arises "from the fact that the prosecutor and the witness have reached an understanding in which the witness's cooperation has been exchanged for some *quid pro quo* on the part of the prosecutor. Once such an understanding has been reached, it is for the jury to determine how much value to assign it in terms of assessing the witness's credibility" *(People v Novoa, supra,* at 497).

In the instant situation, it is evident that Florio, an experienced informant, did indeed anticipate that he would receive some consideration with his New Jersey cases in return for his testimony in defendant's case. Florio had had previous dealings with Hoyt, and his avowed faith in Hoyt no doubt derived from the fact that in the past, he had been accorded certain benefits as a result of providing information to Hoyt and otherwise cooperating with him and the District Attorney's office. Clearly, Hoyt was convinced that Florio expected assistance with his New Jersey cases. While Hoyt did not make any specific promises, he encouraged Florio to trust in his—Hoyt's—and, by extension, the People's intention to do right by Florio. It is certainly not reasonable to conclude that a career criminal such as Florio would agree to assist the prosecution merely as a sign of good will or because he had taken an aversion to defendant's boasting in prison. While it is conceivable that Curran genuinely believed that since she personally, as the trial attorney in defendant's case, had not offered Florio any specific promises in exchange for his testimony, he had no expectations of a benefit, it required that she almost willfully refuse to confront reality to have imagined that Florio was taking the stand simply out of a concern for the public welfare. Curran's repeated denial of the existence of any deal is particularly disingenuous in the face of Hoyt's admonition to her that Florio was a long-time informant who anticipated that something would be done for him with respect to his New Jersey cases. Hoyt, it should be remembered, had become involved precisely at Curran's own urging that he aid in obtaining Florio's cooperation.

In any event, regardless of Curran's opinions on the matter,

the fact remains that Hoyt conveyed a tacit, albeit undefined, promise to Florio that his testimony in defendant's case would somehow be rewarded and also communicated that same commitment to Kravitz. Curran, as a member of the District Attorney's office, was bound by any undertaking, implicit or explicit, on the part of any other representative of the People; she was certainly not warranted in disclaiming a deal simply because she had not personally made it, and this is true even if she herself had possessed no actual knowledge of the agreement. The actions of one part of the District Attorney's office is attributable to every other person in that office, and, Curran, whether unwittingly or not, misled the jury by allowing Florio to testify untruthfully. Not only did she neglect to correct his misleading statements relating to the existence of any promises, but she reaffirmed those statements by means of her own rebuttal, as well as by her subsequent attack during summation upon Kravitz for his contrary testimony. However, the law is established that the failure of the prosecutor to correct a witness' erroneous impression that he had no reason to expect lenient treatment "constitutes 'error so fundamental, so substantial,' that a verdict of guilt will not be permitted to stand. *(People* v. *Creasy,* 236 N.Y. 205, 221.)" *(People v Savvides,* 1 NY2d 554, 557; *see also, People v Piazza,* 48 NY2d 151, 162-163; *People v Mangi,* 10 NY2d 86, 89.) Although the Court of Appeals in *People v Novoa (supra)* more recently declined to reach the issue of whether the nondisclosure to the jury of promises to a witness can, by itself, ever be considered harmless error, it cannot be found here that there is no reasonable possibility that the error in question contributed to defendant's conviction of murder in the second degree, as opposed to manslaughter, and was, therefore, harmless beyond a reasonable doubt *(see, People v Crimmins,* 36 NY2d 230, 237; *Chapman v California,* 386 US 18). Certainly, it was highly prejudicial for Curran to take the stand herself, deny that there was any deal with the witness and then have the opportunity to deliver a summation ridiculing Kravitz and bolstering her own testimony. If Florio's testimony had been discredited, the jury might have believed defendant's assertion that the shooting of Yale Bernstein was accidental.

Consequently, the judgment of the Supreme Court, New York County (Joan Carey, J.), rendered on November 26, 1985, convicting defendant, following a jury trial, of two counts of murder in the second degree and criminal possession of a weapon in the second degree, and sentencing him to two

concurrent terms of imprisonment of from 20 years to life to be served concurrently with a term of from 4 to 12 years, should be reversed, on the law and the facts, the conviction vacated and the matter remanded for a new trial.

MURPHY, P. J., ASCH, ELLERIN and WALLACH, JJ., concur.

Judgment, Supreme Court, New York County, rendered on November 26, 1985, unanimously reversed, on the law and the facts, the conviction vacated and the matter remanded for a new trial.